# In the United States Court of Federal Claims

No. 18-1347C, 15-351C
(consolidated)

(Filed: May 9, 2019)

| | | |
|---|---|---|
| ********************************* | * | |
| | * | |
| AGILITY PUBLIC WAREHOUSING CO., K.S.C.P., | * | |
| | * | |
| Plaintiff, | * | Rule 12(c) Motion for Judgment on the Pleadings; Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction; 28 U.S.C. § 1500; Contracts Disputes Act; Debt Collection Act, 31 U.S.C. § 3716; Declaratory Judgment. |
| v. | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| ********************************* | * | |

*Derek L. Shaffer*, with whom was *Kristin N. Tahler*, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., for Plaintiff.

*William J. Grimaldi*, Senior Trial Counsel, with whom were *Joseph P. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Claudia Burke*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Timothy J. Ryan*, Associate Counsel, DLA Distribution, and *Major Collin P. Evans*, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, and *James D. Stevens*, Assistant District Counsel, and *Pietro Mistretta*, Attorney, Office of Counsel, U.S. Army Corps of Engineers, Middle East District, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiff Agility Public Warehousing Company K.S.C.P. ("Agility") contests the Government's withholding of approximately $17 million in payments due on Contract No. SP3100-05-C-0020 (the "DDKS Contract") to offset a debt Agility purportedly owed to the Government on a separate contract, Contract No. DABV01-04-D-0014 (the "PCO

Contract"). Agility argues that the offset is invalid and that it is entitled to a judgment on the pleadings pursuant to Rule 12(c) of the Court.

Recently, in Agility Logistics Servs. Co. KSC v. Mattis, 887 F.3d 1143 (Fed. Cir. 2018), the Federal Circuit held that the Government was not a party to the PCO Contract; rather, it acted solely as a contract administrator. Agility asserts that the Government cannot now use a purported debt on the PCO Contract—a contract to which it was not a party—as a basis for withholding money owed to Agility on the DDKS Contract—a contract to which it was a party. The Government's offset, Agility explains, was therefore invalid and a breach of the DDKS Contract, a breach of the Government's duty of good faith and fair dealing, and an illegal exaction. Agility also asserts that it is entitled to declaratory judgments regarding the Government's inability to withhold payments to Agility based on the alleged debt owed on the PCO Contract.

The Government responds with its own cross-motion for judgment on the pleadings. Its position is that, while it was not a party to the PCO Contract, the United States Government overpaid Agility for its PCO Contract performance with United States funds while acting as the PCO Contract administrator. Since it was seeking return of United States funds, the Government maintains that it was authorized by statute and common law to offset payments on the DDKS Contract to recoup its alleged overpayment on the PCO Contract. The Government also contests jurisdiction in this Court pursuant to Rule 12(b)(1). It asserts that 28 U.S.C. § 1500 forecloses jurisdiction to hear Agility's breach of contract claim in the Court. The Government adds that Agility's claim for a declaratory judgment regarding the Government's ability to offset Agility's alleged debt under the PCO Contract is also jurisdictionally barred.

For the reasons outlined below, the Court DENIES Agility's Motion for Judgment on the Pleadings. The Court GRANTS the Government's Cross-Motion for Judgment on the Pleadings and GRANTS in part and DENIES in part its Motion to Dismiss.

## Background

### A. The PCO Contract

#### 1. History of the PCO Contract

Following the invasion of Iraq, "the United States, the United Kingdom and Coalition partners" created the Coalition Provisional Authority ("CPA") "to exercise powers of government [in Iraq] temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction." 2d. Am. Compl. ¶ 37 (internal quotation marks omitted). The CPA awarded

the PCO Contract to Agility on June 6, 2004.[1] That contract required Agility to "provide all resources including logistics support and management necessary to operate and maintain two geographically separated Distribution Center Warehouse and Staging Area operations as part of an over strategic supply chain management system supporting the reconstitution of Iraqi Security Forces and reconstruction support of Iraq Civil Infrastructure." Id. ¶ 39 (internal quotation marks omitted). Under the PCO Contract, the PCO Contract administrator would issue task orders for specific supplies and services as required.

Agility and the CPA were the original parties to the PCO Contract, but both the contracting party opposite Agility and the contract administrator changed over the life of the contract. CPA Memoranda (which were incorporated into the PCO Contract by reference) called for the CPA's dissolution by June 30, 2004, with its governmental authority transferring to the Interim Iraqi Government ("IIG" or the "Iraqi government"). Id. ¶ 47. Those memoranda also named the IIG as the CPA's successor in interest on the PCO Contract. Id. ¶ 48. In late June, the CPA dissolved, authority vested in the IIG, and the IIG assumed the PCO Contract. Id. ¶¶ 49-50.

The CPA's dissolution also triggered a change in the PCO Contract administrator. Id. ¶ 51. Distinct from the contract holder, the administrator held "the authority, through a duly appointed Procuring Contract Officer, to enter into, administer, and/or terminate this contract and make related determinations and findings." Id. ¶ 53. The CPA's Program Management Office initially served as administrator with the United States Army acting as the executive agent. Id. ¶ 52. Following "the transfer of full governance authority to the [IIG]," the IIG could delegate "responsibility to monitor and confirm performance, certify and/or make payments, and otherwise administer" the PCO Contract to "the Chief of Mission of the United States Embassy, Baghdad and/or the Commander of the Multi-National Force-I." Id. ¶ 55 (quoting id. Ex. F).

The IIG's Finance Minister made the above delegations effective June 30, 2004. Id. ¶ 56. The U.S. Embassy in Baghdad and Commander of the Multi-National Force-I further delegated power to administer the PCO Contract to the Project and Contracting Office ("PCO"), a U.S. Government entity.[2] Id. ¶ 58. In summation, by the PCO Contract's termination on November 5, 2008, the IIG and Agility were parties to the contract, with the U.S. Government administering the contract via the PCO.

---

[1] The CPA originally awarded the contract to Public Warehousing Company. Agility is that entity's successor in interest.

[2] The PCO originally operated under the Department of Defense but later became part of the Department of the Army. Id. ¶ 58.

2. The Government Asserts Overpayment

In September 2010, the Army contracting officer issued final decisions determining that the United States Government had overpaid approximately $80 million to Agility for its work performed on the PCO Contract.[3] Id. ¶¶ 62, 67, 74. The contracting officer sent twelve demand letters to Agility regarding the alleged overpayments, each stating that Agility was "indebted to the United States Government." E.g., id. Ex. I. These letters also warned Agility that its alleged debt could be subject to "offset from Federal payments due." Id.

3. Agility Challenges its Purported Debt

In November 2010, Agility brought an action before the Armed Services Board of Contract Appeals ("ASBCA") (1) challenging the contracting officer's decision regarding Agility's debt on the PCO Contract and (2) seeking approximately $47 million in unpaid fees on the same contract. The ASBCA dismissed the action, holding that it did not have jurisdiction to hear Agility's case under the Contract Disputes Act, 41 U.S.C. § 7104 ("CDA"). See Agility Logistics Servs. K.S.C.P., ASBCA Nos. 57415 *et al*., 15-1 BCA ¶ 35,840 (Dec. 9, 2014). CDA jurisdiction is limited to contracts made by an executive agency. The ASBCA determined that since the Government merely acted as contract administrator and not a contracting party, and neither the CPA nor the IIG were executive agencies as defined by the CDA, the ASBCA was without jurisdiction. Agility appealed this decision to the Federal Circuit. See Agility Logistics Servs. Co. KSC v. Mattis, 887 F.3d 1143 (Fed. Cir. 2018).

The Federal Circuit agreed with the ASBCA that the Government acted "as a contract administrator and not as a contracting party" on the PCO Contract. Id. at 1151. Accordingly, the appeals court held that the ASBCA lacked CDA jurisdiction over the PCO Contract because it was not '"made by' an executive agency." Id. at 1148.

The Federal Circuit also discussed the source of funds paid on these disputed task orders. The PCO Contract originally specified that "[t]he obligation under this contract is made with Iraqi funds," which included funds from the Development Fund for Iraq.[4] Id. at 1146. Thereafter, the Federal Circuit noted that the source of funds available for payments on the PCO Contract changed. For task orders 3, 6, 9-12, and 14-20 (the same task orders at issue in the present dispute), the U.S., as the PCO Contract administrator and "as an agent" of the Iraqi government, began paying Agility with U.S. funds. Id. at 1147, 1151.

[3] The contracting officer claimed overpayment on task orders 3, 6, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 20. Id. ¶ 62.

[4] "The [Development Fund for Iraq] was a fund administered by the CPA and composed of various sources, including revenue from sales of Iraqi petroleum and natural gas." Agility Logistics, 887 F.3d at 1146 n.2.

B. The DDKS Contract

1. The DDKS Contract's Terms

In the summer of 2005, the U.S. Defense Logistics Agency ("DLA") contracted with Agility to establish a contractor owned and operated distribution depot in Kuwait. 2d Am. Compl. ¶¶ 15-17. Over the contract's approximately six-year lifespan, the contracting officer was generally satisfied with Agility's performance and approved and paid Agility's invoices. Id. ¶¶ 25-31. Toward the end of the contract, however, the Government withheld $17,221,029 in payments due. While the Government concedes that this amount is owed on the DDKS Contract, it maintains that it lawfully withheld the sum to offset Agility's alleged debt to the Government on the PCO Contract. Id. ¶¶ 34-35.

2. The Government Offset Money Owed to Agility on the DDKS Contract Against Agility's Purported Debt on the PCO Contract.

In or around April 2011, the Government began exploring the idea of offsetting DLA's payments due to Agility on the DDKS Contract to offset Agility's purported debt owed to the Army on the PCO Contract. See id. ¶ 72 ("DLA has some money it owes PWC/Agility. DLA would like to just apply that against what we say that the PWC/Agility owes us in the appeals."); id. ¶ 74 (advising that it would be "in the interests of DOD and the Federal Government for the DLA payments to go to the Army via an offset . . . ." ). The Government initially pursued an offset under the Treasury Department Offset Program. In early July 2011, the U.S. Army Corps of Engineers Finance Center emailed Agility saying that "a debt payable to the U.S. Corps of Engineers" on the PCO Contract would be "loaded into the Treasury Offset Program for collection." Id. ¶ 76. However, Treasury later explained internally that such an offset was impossible. Only debtors with a "U.S. tax ID" can be subject to the Treasury Offset Program. Id. Ex. J at 265, 288. Agility, as a Kuwaiti company, has no such ID, and therefore cannot be subject to a Treasury offset. Id. ¶¶ 79-80. As an alternative, Treasury recommended pursuing an "agency to agency" offset. Id. Ex. J at 267. By late July 2011, the Government had taken steps to carry out this offset. Id. Ex. J at 262-63.

In or around September 2012, the Government notified Agility that it had withheld payments on the DDKS Contract to offset the alleged PCO Contract debt. Id. ¶ 7-8. The Government took second and third offsets in or around December 2012 and July 2013. The Government maintains in its communications with Agility that the debt on the PCO Contract is a debt owed to the United States. See, e.g., id. ¶ 93. There is no indication that the Iraqi government was involved in the decision to withhold payment on the DDKS Contract.

## Procedural History[5]

In 2015, Agility filed a claim with this Court challenging the contracting officer's September 2010 decision regarding Agility's purported $80 million debt on the PCO Contract, and denial of Agility's claim. See Agility Public Warehousing Co., K.S.C.P. v. United States, No. 15-cv-00351 ("Case No. 15-351"). In 2016, Agility challenged the PCO Contract debt under the Administrative Procedures Act in the U.S. District Court for the District of Columbia. See Agility Public Warehousing Co. K.S.C.P. v. U.S. Dep't of Defense, et al., No. 16-cv-01837.

On July 3, 2017, Agility submitted a certified claim to DLA seeking payment of the $17,662,906.90 in unpaid invoices plus interest. The contracting officer reported to Agility that DLA intended to hold Agility's certified claim in abeyance due to ongoing litigation. 2d Am. Compl. ¶ 95.

Agility then filed a second suit in this Court on August 31, 2018. See Agility Public Warehousing, Co., K.S.C.P v. United States, No. 18-cv-01347 ("Case No. 18-1347"). Approximately one month later, Agility filed a First Amended Complaint in Case No. 18-1347 and a request for leave to file an identical amended complaint in Case No. 15-351. See Case No. 18-1347, Dkt. No. 7; No. 15-351, Dkt. No. 21. That same day, Plaintiff moved to consolidate the two cases. See Case No. 18-1347, Dkt. No. 8.

On November 6, 2018, Agility filed a Second Amended Complaint in Case No. 18-1347 and a request for leave to file an identical amended complaint in Case No. 15-351. See Case No. 18-1347, Dkt. No. 12; Case No. 15-351, Dkt. No. 26. That complaint raised five counts: Count I alleges the offset constituted a breach of the DDKS Contract; Count II asserts that the Government illegally exacted the approximately $17 million subject to offset; Count III claims that the offset constituted a breach of the Government's duty of good faith and fair dealing; Count IV seeks prompt payment of interest accumulated on the approximately $17 million; and Count V requests declaratory judgments that (1) the Government's offset to collect a debt on the PCO Contract is unlawful, and (2) the Government, going forward, cannot withhold amounts owed to Agility based on Agility's alleged debt under the PCO Contract. See 2d Am. Compl. ¶¶ 135-69.

On December 6, 2018, the Court issued two orders. First, it determined that the two Second Amended Complaints posed "identical questions of law and fact" and consolidated the actions under Case No. 18-1347. See Case No. 18-1347, Dkt. No. 20. Second, "[i]n light of the [C]ourt's order consolidating the above-captioned case with No. 18-1347" the Court denied Plaintiff's motion for leave to file its Second Amended Complaint as moot. Case No. 15-351, Dkt. No. 32.

[5] On January 23, 2019, this consolidated action was transferred to Judge Thomas C. Wheeler. Case No. 18-1347, Dkt. No. 24-25.

Three days before the Court consolidated Agility's two cases, Plaintiff filed a motion for judgment on the pleadings pursuant to Rule 12(c). See Case No. 18-1347, Dkt. No. 18. On December 17, 2018, the Government cross-moved for judgment on the pleadings and moved to dismiss the case for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). See Case No. 18-1347, Dkt. No. 21. Plaintiff filed its response and reply on December 28, 2018, and the Government filed its reply on February 14, 2019. See Case No. 18-1347, Dkt. No. 29. The Court heard oral argument on February 28, 2019.

## Discussion

### A. Jurisdiction

#### 1. Standard of Review

Whether the Court has jurisdiction to decide the merits of a case is a threshold matter. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). When deciding a Rule 12(b)(1) motion to dismiss, a court must assume all the undisputed facts in the complaint are true and draw reasonable inferences in the non-movant's favor. Erikson v. Pardus, 551 U.S. 89, 91 (2007). Further, the plaintiff bears the burden of establishing facts sufficient to invoke this Court's jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). In determining whether a plaintiff has met this burden, courts may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)).

#### 2. 28 U.S.C. § 1500 Does Not Bar Jurisdiction in this Court.

The Tucker Act confers jurisdiction upon this Court to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . . or upon any express or implied contract with the United States . . . ." 28 U.S.C. §1491(a)(1). Still, the Tucker Act does not create a separate right to money damages. A plaintiff suing the Government for money damages must therefore base its claims upon a separate source of law that creates such a right. See United States v. Testan, 424 U.S. 392, 398 (1976). At first pass, the CDA appears to provide this Court with jurisdiction over Agility's claims on the DDKS Contract. However, 28 U.S.C. § 1500 limits the Tucker Act's jurisdictional grant:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process

> arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

To foreclose jurisdiction on section 1500 grounds, a court must answer two questions in the affirmative: "(1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim or claims asserted in the later-filed action in [this court]." Brandt v. United States, 710 F.3d 1369, 1374 (Fed. Cir. 2013) (citing Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163–64 (Fed. Cir. 2011)).

a. "Earlier-Filed Suit or Process Pending in Another Court"

A claim remains "pending in another court" from the time that it is filed until the time that judgment is entered. Brandt, 710 F.3d at 1379-80. In applying this jurisdictional bar, a court must look to the conditions as they existed at the time the complaint was filed in the Court of Federal Claims. See, e.g., Keene Corp. v. United States, 508 U.S. 200, 207 (1993) (directing courts to focus on "the state of things at the time of the action brought"); Central Pines Land Co. LLC v. United States, 697 F.3d 1360, 1367 (Fed. Cir. 2012). Agility initially "brought" this consolidated action as two separate cases: Case No. 15-351 and Case No. 18-1347. The Court will therefore address each action in turn as they existed before consolidation.

i. Case No. 15-351

Agility first filed its complaint in Case No. 15-351 in this Court on April 7, 2015, then filed its complaint in the D.C. District Court on September 14, 2016. The original complaint in Case No. 15-351 presents no pendency issue because Agility filed it one year before the District Court action. However, Agility then filed two motions for leave to file First and Second Amended Complaints in Case No. 15-351, and identical First and Second Amended Complaints filed in Case No. 18-1347 on September 21, 2018 and November 6, 2018, respectively. The Court chose to consolidate Case No. 15-351 and Case No. 18-1347 "[b]ecause the operative complaints in both cases are identical" which enabled the Court "to issue a single determination governing each of Plaintiff's claims and requests for relief." Case No. 18-1347, Dkt. No. 20. "In light of the [C]ourt's order consolidating . . . [Case No. 15-351] with No. 18-1347" the Court denied Plaintiff's motion to for leave to file its Second Amended Complaint as moot. Case No. 15-351, Dkt. No. 32.

Agility asserts that its supplemental pleadings in Case No. 15-351 pose no pendency issue for that case: "the order-of-filing rule dictates that, when an amended complaint is filed, the relevant date for establishing whether 28 U.S.C. § 1500 applies is the date the original complaint was filed." Pl. Reply at 28. However, while the Court recognized Plaintiff's Second Amended Complaint in Case No. 15-351 as the "operative complaint," it did not grant Plaintiff leave to file that amendment, instead finding that issue moot.

Though Rule 15 provides that amended complaints relate back to the date the original pleading was filed, Agility's Second Amended complaint filed in Case No. 15-351 cannot relate back to 2015 because the Court did not grant Agility leave to amend. Therefore, Agility's original 2015 complaint in Case No. 15-351 was not pending when Agility filed its case in the District Court, but its second amended complaint was pending.

ii. Case No. 18-1347

Agility filed its original complaint in Case No. 18-1347 on August 31, 2018, approximately two years after Agility initiated its D.C. District Court case. Case No. 18-1347's consolidation with Case No. 15-351 does not permit Agility to borrow Case No. 15-351's earlier filing date; doing so would be to improperly "rescue[] by subsequent action." Central Pines, 697 F.3d at 1367. The D.C. District Court case was, therefore, pending when Agility brought Case No. 18-1347.

b. "For or in Respect to the Same Claim"

"Two suits are for or in respect to the same claim . . . if they are based on substantially the same operative facts, regardless of the relief sought in each suit." United States v. Tohono O'Odham Nation, 563 U.S. 307 (2011). "Operative facts" are those which provide the essential elements of the claims alleged in the two suits. These are distinct from "background facts" which only serve to describe the context for the claims presented in each suit. See U.S. Home Corp. v. United States, 108 Fed. Cl. 191, 195 (2012), aff'd, 550 F. App'x 895 (Fed. Cir. 2014).

The Government argues that the operative complaints before this Court allege the same operative facts as Agility's case before the District Court. Defendant's claim turns on paragraph 229 of Plaintiff's complaint filed in the District Court, which provides:

> The Defendants' actions in offsetting—or making available for offsetting—Agility's claimed debts against amounts owed to Agility under other Government contracts were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A), and were imposed without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

The Government reads this paragraph as a broad challenge to all offsets that the Government has taken in furtherance of the debt purportedly owed on the PCO Contract.

The Government is correct. Agility challenges the same conduct in both actions. Paragraph 167 of Plaintiff's complaint before the D.C. District Court details the Government's definitization of Agility's PCO Contract task order invoices which became the basis for the Government's claimed debt. In paragraph 229, Agility challenges the

Government's allegedly arbitrary offsets to satisfy Agility's purported debt—the offset on the DDKS Contract was one such offset. In the consolidated complaints before this Court, Agility alleges that the Government violated the DDKS Contract when it illegally withheld funds due on that contract to collect the purported PCO Contract debt. Though Agility may base its claims on two different contracts, it alleges that the Government's liability on each stem from the same behavior. The claims are, therefore, "for or in respect to" the same claim.

Agility attempts to distinguish the two claims based on issues of timing. It maintains that the two suits cannot be based on the same operative facts since Case No. 18-1347 implicates "events that had not transpired when [the District Court action] was filed." Pl. Mot. at 39. However, the relevant inquiry is not into what is claimed but rather into the facts that go to support a claim. The basis for both claims is the offset taken on the DDKS Contract to recoup an alleged debt on the PCO Contract. Lastly, it is immaterial that Agility's D.C. District Court complaint cites APA violations, while its case here invokes the CDA. In determining whether two cases present a common claim, a court must look to the operative facts, and not legal theories pursued. See Johns-Manville Corp. v. United States, 855 F.2d 1556, 1564 (Fed. Cir. 1988) (explaining that the term "claim" for section 1500 purposes, "has no reference to the legal theory upon which claimant seeks to enforce his demand"). Accordingly, the fact that Agility's two claims invoke different theories of recovery is of no moment.

c. Granting Agility's Motion for Leave to Supplement its Complaint in Case No. 15-351 Provides the Court with Jurisdiction.

i. Agility's Motion Was Not Moot.

Section 1500 does not pose as a barrier to jurisdiction for the original complaint in Case No. 15-351 because that case predated Agility's D.C. District Court case. But the Court does not have jurisdiction over Case No. 18-1347. Nor does it have jurisdiction over the Plaintiff's amended complaints in Case No. 15-351 since it raises the same operative facts as Plaintiff's District Court case and the Court did not grant amendment so that they relate back to 2015 (before Agility filed the D.C. District Court case).

Despite the Court's previous conclusion, it is clear that the issue of amendment in Case No. 15-351 was not moot. Rather, whether the Court grants Agility leave to amend its complaint in Case No. 15-351 is dispositive as to the question of jurisdiction: permitting amendment allows Plaintiff's Second Amended Complaint to relate back to the date of original filing in 2015 and cure any section 1500 issue. Accordingly, the Court will revisit its decision regarding the mootness of Agility's motion for leave to file its Second Amended Complaint. See Case No. 15-351, Dkt. No. 32.

ii. Agility May Amend its Complaint in Case No. 15-351.

Rule 15(d) provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Courts have construed Rule 15 to favor amendment. See, e.g., Sonoran Tech. & Prof'l Servs., LLC v. United States, 133 Fed. Cl. 401, 403 (2017). Indeed, leave to amend a complaint should be "freely give[n]" absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). Pursuant to this amendment-friendly regime, a plaintiff should be granted leave to supplement its complaint when events occur after the time the plaintiff filed its original complaint, and these later events relate to those already plead. See Intrepid v. Pollock, 907 F.2d 1125, 1129 (Fed. Cir. 1990) ("Where the supplemental pleading with respect to such later events relates to the same cause of action originally pleaded, . . . that would be an abuse of discretion to deny the amendment) (citing Griffin v. School Board, 377 U.S. 218, 227 (1964)).

Agility's 2015 action seeks relief based on the PCO Contract, but that case includes allegations based on the DDKS Contract. See Case No. 15-351, Dkt. No. 1 ¶¶ 104, 149. Agility's 2018 case challenges offsets made on the DDKS Contract and argues that the Government's claim for money on the PCO Contract is inconsistent with the Federal Circuit's 2018 ruling in Agility Logistics. Though Agility shifts its focus from the PCO Contract to the DDKS Contract, these later events relate to the DDKS Contract which was at issue in Agility's 2015 complaint. Moreover, it is of no concern that Agility raises facts transpiring after it filed its original complaint in Case No. 15-351—Rule 15(d) expressly allows for this type of supplemental pleading.

Lastly, regarding procedure, the Supreme Court has provided that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Conley v. Gibson, 355 U.S. 41, 48 (1957) (discussing procedural rules regarding sufficiency of pleadings). Permitting amendment is, therefore, also consistent with the spirit of the rules of procedure.

Accordingly, the Court VACATES its previous order issued in Case No. 15-351, Dkt. No. 32, on December 6, 2018, and GRANTS Agility's motion to file a second amended complaint in Case No. 15-351, Dkt. No. 26. Agility has CDA jurisdiction over this dispute, and section 1500 does not act as a bar to jurisdiction.

3. The Court Has Jurisdiction to Grant Plaintiff's Request for Declaratory Relief on the PCO Contract.

In its complaint, Agility asks this Court for a declaratory judgment that the United States cannot, in the future, offset the purported PCO Contract debt with payments due on the DDKS Contract: "Agility is entitled to a declaratory judgment that the U.S. Government may not legally withhold amounts owed by the United States to Agility based on Agility's purported debt under the PCO Contract." 2d Am. Compl. ¶ 169. The Government characterizes Agility's request as a direct challenge to the PCO Contract. The Court has no jurisdiction to grant that relief, the Government explains, because (1) Agility's claim is a claim for relief on the PCO Contract, a contract over which this Court does not have jurisdiction, and (2) Agility's request is neither tied nor subordinate to monetary relief pertaining to the PCO Contract. The Court disagrees. The crux of Agility's case is that the Government cannot withhold payment on the DDKS Contract in satisfaction of a debt on the PCO Contract because, as a non-party to that contract, the Government cannot be owed a debt. If the Court finds that the Government's offset was illegally taken, it must find that the Government may not claim that its purported debt owed on the PCO Contract is a legitimate basis for the Government to offset funds. Agility's request to declare that the Government cannot withhold funds to satisfy a debt on the PCO Contract, therefore, is simply a prerequisite to the monetary relief it seeks on the DDKS Contract. In sum, both of the Government's jurisdictional challenges fail.

B. Merits of the Dispute

1. Standard of Review

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the party is entitled to judgment as a matter of law." Forest Labs., Inc. v. United States, 476 F.3d 877, 881 (Fed. Cir. 2007). "When deciding a motion for judgment on the pleadings based on the merits of the complaint and the answer submitted by the parties, the court may review 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice.'" Crusan v. United States, 86 Fed. Cl. 415, 417-18 (2009) (quoting 5C Wright & Miller, Federal Practice and Procedure § 1367 (2008)). The Court must assume each well-plead factual allegation to be true and give all inferences in favor of the non-movant. See Owen v. United States, 851 F.2d 1404, 1407 (Fed. Cir. 1988).

2. Offset Taken on the DDKS Contract

The central issue in this case is whether the Government was entitled to offset funds—pursuant to either the Debt Collection Act, 31 U.S.C. § 3716 or the common law of offset—to recover monies the government paid on a contract which the Government

administered but to which it was not a party. All of Agility's claims derive from this central question: if the Court finds the offset justified, then all of Plaintiff's claims fail; if the Government took this offset illegally, Agility succeeds on all its claims.[6]

The Government asserts that it can offset amounts to satisfy debts owed to the United States notwithstanding the lack of a contractual relationship between itself and Agility. The key, the United States explains, is that the Government paid Agility with funds that belonged to the United States. Agility contests that reasoning. Whether the Government made the alleged overpayments with U.S. funds, Agility explains, is irrelevant. In Agility Logistics Servs. Co. KSC v. Mattis, 887 F.3d 1143 (Fed. Cir. 2018), the Government maintained that it acted as Iraq's agent. As an agent, the Government distributed United States funds on behalf of the Iraqi government. See Oral Arg. Tr. at 5:11-16 ("[T]he United States said, money is fungible, their point of emphasis was the monies were paid for Iraq, for the benefit of the Iraqi people, and it was only in its capacity as a contract administrator, an agent of Iraq, that the funds went from the United States to Agility."); see also Oral Arg. at 21:30-23:50, Agility, 887 F.3d 1143, http://oralarguments.cafc.uscourts.gov/Audiomp3/2015-1555.mp3. Agility asserts that because the U.S. Government was not a party to the PCO Contract, it cannot bring a claim against Agility based on that contract. Accordingly, the Court is left with one dispositive question: must the Government first assert that a debt is owed based on a separate legal right to money or does the Government have a freestanding right to offset amounts under common law or by statute?

a. The Government's Common Law Offset Was Invalid.

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995) (quoting Studley v. Boylston Nat. Bank, 229 U.S. 523, 528 (1913)).[7] "This right extends not only to debts on [a single contract] but to any other contract between the government and the same contractor." J.G.B. Enterprises, Inc. v. United States, 497 F.3d 1259 (Fed. Cir. 2007) (citing Cecile Indus., 995 F.2d at 1054). The extent of the Government's right to offset is the same as any private individual. Ensley, Inc. v. United States, 114 Fed. Cl. 704, 714 (2014); see also United States v. Munsey Trust Co. of Washington, D.C., 332 U.S. 234, 239 (1947) (noting that the Government has "the same right which belongs to every creditor, to apply the unappropriated monies of his debtor, in his hands, in extinguishment of the debts due to him.").

[6] This conclusion assumes that there are no material facts in dispute. The Court addresses this issue herein.

[7] The Government's common law right to offset survives the Debt Collection Act's passage. See, e.g., Cecile Indus., Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993).

To effectuate a common law offset, the Government must take three steps: (1) decide to take an offset; (2) take some act to accomplish the offset; and (3) record the offset. HSH Nordbank AG v. United States, 121 Fed. Cl. 332, 345 (2015) (quoting Citizens Bank, 516 U.S. at 19). However, a prerequisite to a valid offset is that mutual debts exist between the parties. For a debt to exist, the offsetting party must have a valid claim against the party subject to the offset. See J.G.B. Enterprises, 497 F.3d at 1259. J.G.B. Enterprises illustrates this mutuality requirement. There, the Government set up an escrow agent to pay a subcontractor directly after a prime contractor failed to pay the subcontractor. The Government then withheld payments owed to the subcontractor to offset a debt that the prime contractor owed to the Government on another, unrelated contract. The subcontractor challenged the offset as invalid and the Federal Circuit agreed. It held that "the government must itself have a valid *claim* against the party subject to the setoff" and that its claim here was against the prime contractor, not the subcontractor. Id. at 1262 (emphasis in original). The court also noted that this principal applies in the reverse: a subcontractor generally has no claim against the Government even if the subcontractor is owed money because those parties are not in a contractual relationship. See id. ("A subcontractor typically is unable to seek relief against the United States on a dispute over the contract since it is not a party to the contract and thus lacks privity with the United States.").

Accordingly, the "claim" necessary to effectuate an offset is not some freestanding claim to the funds themselves. Rather, the offsetting party must have some separately existing legal right to the monies, like a claim grounded in contract. Debts subject to common law offset are, therefore, limited to those debts between parties in privity—those parties that have a legal basis to sue and be sued by one another.

The requisite mutuality, therefore, is not present here. The United States was not a party to the PCO Contract, and Agility and the United States are not in privity. See Agility Logistics, 887 F.3d at 1151-52. Indeed, the Federal Circuit foreclosed Agility from bringing a claim against the United States relating to the PCO Contract for this very reason. See id. Notwithstanding this lack of contractual privity, the Government asserts that it holds a valid claim against Agility because it made overpayments to Agility on the PCO Contract with U.S. funds. This assertion is the sort of freestanding claim to funds that cannot give rise to a valid offset. The Government may have paid, and the funds may ultimately be returned to the United States, but since it was not a contracting party, it does not have a valid claim against Agility for a debt on the PCO Contract. As the contracting party opposite Agility, if any debt exists, it is Iraq's to collect and return to its agent, the United States. Since there are no mutual debts here between Agility and the United States, the U.S. Government's common law offset was invalid.[8]

---

[8] It cannot be that the common law creates a situation where the Government can recover against Agility on the PCO Contract but is insulated from any challenge that Agility may bring. No party—not even the Government—possesses such super-contractual rights under common law.

b. The Government's Statutory Offset Was Permissible.

i. The Government did not Take its Offset Pursuant to the Treasury Offset Program.

The parties agree that the Treasury's offset program was unavailable here. See Pl. Mot. at 23; Oral Arg. Tr. at 19:22-20:5; Def. Reply at 10. Agility points to the Government's July 8, 2011 letter to Agility which stated that Agility's purported debt on the PCO Contract would be "loaded into the Treasury Offset Program for collection" as evidence of a factual dispute as to whether the Government improperly took its statutory offset pursuant to the Treasury program. 2d Am. Compl. Ex. K at 275; Oral Arg. Tr. at 52:23-53:7. However, internal communications show that the Government realized that the Treasury program was not a viable avenue for pursuing an offset, see 2d Am. Compl. Ex. J at 265-68, and abandoned that plan in favor of an agency to agency offset. See id. Accordingly, Agility's attempt to inject a factual dispute is unavailing.

ii. The Government Can Execute an Administrative Offset.

The Debt Collection Act, 31 U.S.C. § 3716(a) authorizes agency heads to initiate an "administrative offset" to collect a "claim." An administrative offset is a process for "withholding funds payable to the United States (including funds payable by the United States on behalf of a State government) to, or held by the United States for, a person to satisfy a claim." See § 3701(a)(1). A claim for purposes of a section 3716 offset constitutes "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person . . . includ[ing] . . . over-payments." See § 3701(b)(1)(C). Administrative offsets can occur within a single agency or among several cooperating agencies. See 31 C.F.R. § 901.3(c)(1).

The statute defines a claim which may properly be subject to offset to include a sum owed to the United States. The provision makes no reference to whether such a claim must be grounded in a separate legal right to that sum. Rather, a claim's validity turns on whether an appropriate government official determined that an amount is owed. Accordingly, the statutory scheme seems concerned not with the legal relationship between the United States and the debtor, but instead with the question of whether the United States is owed some amount of money. As such, the Debt Collection Act gives the Government a freestanding right to collect on its debts as defined in that subsection.

The U.S. Government paid United States funds to Agility on the disputed PCO Contract task orders. Agility Logistics, 887 F.3d at 1147, 1151. The contracting officer here found that a debt was owed; the official issued final decisions regarding each task order, determined that the United States overpaid Agility approximately $80 million, id. at 1147-48, and sent notice to Agility. 2d Am. Compl. Ex. I at 218-57. Properly determined over payments are a "claim" which may be subject to offset. Accordingly, the

contracting officer's determination of an over payment gave the Government a "claim" which it could collect on through an administrative offset. The statutory scheme's plain language is clear, and this Court is powerless to interpret that scheme differently.[9] The United States Government's status as contract administrator to the PCO Contract is inconsequential—despite its status as a non-contracting party, the Government still holds an actionable "claim" as defined under the Debt Collection Act.

Lastly, determining the Government's statutory powers to be broader than those under the common law is not inconsistent with this Court's findings that the Government's offset was invalid under the common law. Congress, as it has done here, is free to change the common law standard through statute. A more expansive statutory right to offset is also consistent with the Debt Collection Act's stricter procedural requirements required to effectuate an offset as discussed below.

iii. The Government Followed the Proper Procedure for Effectuating a Statutory Offset.

Before making an offset under this statutory framework, the Government must provide the debtor with "written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section." § 3716(a)(1). The debtor must also be afforded the opportunity to inspect records relating to the claim, and opportunity for review of the agency's decision within the agency making the offset, and the ability to enter into a repayment agreement with the agency. § 3716(a)(2)-(4).

The letters accompanying the invoices the Government sent to Agility indicate that the Government acted in accordance with the Debt Collection Act. See, e.g., Def. Mot. at DA 1 ("Under the provisions of . . . the Debt Collection Act of 1982, payment of this debt is due within 30 days . . . ."); 2d Am. Compl. Ex. J at 268 (confirming in an internal email that Agility received notice pursuant to section 3716). Moreover, the bills and accompanying letters sent to Agility contained this statutorily required information. See id. App. DA1-34. The Government, therefore, followed the proper procedure to implement its offset. [10]

---

[9] Agility also argues that the Army cannot offset funds pursuant to this statutory scheme because it cannot be a "creditor agency". See § 3701(e)(1). The Army's status as a "creditor agency" is irrelevant here; section 3716(a) permits a "head of an executive, judicial, or legislative agency" to offset funds. That is what was done here.

[10] The Department of Defense had implemented the Debt Collection Act by the time it took this offset. See Department of Defense, Summary of Major Changes to DoD 7000.14-R, Volume 10, Chapter 18: Contractor Debt Collection, https://comptroller.defense.gov/Portals/45/documents/fmr/archive/10arch/10_18_Jul09.pdf.

3. Judicial Estoppel Does Not Preclude the Government from Arguing for the Offset's Validity.[11]

"The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996). Courts have looked to three non-exclusive factors: "(1) whether the 'party's later position [is] 'clearly inconsistent' with its earlier position"; (2) 'whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States, 593 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001)). Judicial estoppel applies equally against the Government as it does private parties. See Cuyahoga Metro. Hous. Auth. v. United States, 65 Fed. Cl. 534, 554–57 (2005).

Agility argues that the Government should be precluded from arguing that Agility owes it a debt because "the United States, not Iraq, paid Agility with United States funds." Def. Mot. at 28. In Agility Logistics, the Government distanced itself from the PCO Contract and successfully argued that the Federal Circuit should recognize its status as a mere agent, and that Agility's claim was against the Iraqi government as the contracting partner. Now, the Government says that it is owed a debt on that same contract from which it initially distanced itself. Agility sees these positions as irreconcilable. The Court disagrees. It does not necessarily follow that for the U.S. to administer funds as an agent for (and for the benefit of) Iraq, the funds must lose their status as money belonging to the United States. Indeed, as described above, the Debt Collection Act's plain language permits the Government to collect a claim via offset if the Government is owed a "claim", which includes a properly determined overpayment. Accordingly, the Government is not estopped from advancing its argument.

The Government's statutory offset was authorized under the Debt Collection Act. All of Agility's counts in its complaint are derivative of this fundamental question. See, e.g., Def. Mot. at 34; Or. Arg. Tr. at 9:24-10:18. All of Plaintiff's claims fail as a result.

## Conclusion

For the reasons stated above, the Court's order in Case No. 15-351, Dkt. No. 32 issued on December 6, 2018 is VACATED. Agility's motion to file a second amended complaint in Case No. 15-351, Dkt No. 26, is GRANTED. The Court directs the Clerk of

[11] Plaintiff raises this judicial estoppel defense for the first time in its reply brief.

Court to sever Case No. 18-1347 from this consolidated action. Lastly, the Court deems the parties' briefs filed as Dkt. Nos. 18, 21, 22, and 29 in Case No. 18-1347 to have also been filed in Case No. 15-351.

Also pursuant to the above, the Court DENIES Defendant's motion to dismiss for lack of subject matter jurisdiction as to Case No. 15-351, GRANTS Defendant's motion to dismiss for lack of subject matter jurisdiction as to Case No. 18-1347, and DENIES Defendant's motion to dismiss Plaintiff's request for declaratory relief for lack of subject matter jurisdiction. The Court also DENIES Plaintiff's motion for judgment on the pleadings, and GRANTS Defendant's cross-motion for judgment on the pleadings. The Clerk shall enter judgment in favor of the Government. No costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge